UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| National Steel Company, | ) | Case No. 02 B 8699 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| NSC Creditor Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 04 A 1322 |
| | ) | |
| BSI Alloys, Inc. | ) | |
| | ) | |
| Defendant. | ) | Judge Jacqueline P. Cox |

## MEMORANDUM OPINION

This Chapter 11 case is before the Court on an adversary proceeding brought by National Steel Creditor Trust to avoid, as preferences, pre-petition payments made by debtor National Steel Company to BSI Alloys, Inc.

The defendant answered the complaint and asserted two affirmative defenses to the claims: a new value defense under 11 U.S.C. § 547(c)(4) and an ordinary course defense under 11 U.S.C. § 547(c)(2). The Trust's motion for partial summary judgment as to the second, third and fourth transfers followed. BSI has also filed a motion for summary judgment. The crux of this matter is whether BSI can avail itself of the ordinary course defense.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of

material fact and that the moving party is entitled to judgment as a matter of law. Bankruptcy Rule 7056. To resist, the non-moving party must present sufficient evidence to show that there is a genuine issue for trial or show that it is entitled to judgment as a matter of law on the basis of uncontested facts.

For more than two years prior to the preference period of December 6, 2001, to March 5, 2002, BSI sold High Carbon Ferromanganese (HCFeMn) to National Steel Corporation ("NSC") for use in the manufacture of steel. The sales were made on "Prox 25" payment terms. "Prox 25" required NSC to pay an invoice on the 25th day of the month following the month of the invoice date (or the next business day after the 25th day of the month if the 25th day fell on a Saturday, Sunday or holiday).

The parties had annual contracts covering the purchase of ferroalloys. During the preference period the payment terms were changed pursuant to the their annual contracting procedures to "net 30," which required payment within 30 days of the invoice date. During the preference period NSC paid BSI $943,581.33 split into four transfers. On the bankruptcy-filing date, BSI had outstanding unpaid invoices for nine other pre-petition transfers.

### The Second Transfer

Summary judgment is not being sought for the first transfer. The second transfer of $341,486.70 covered six invoices issued between December 5, 2001, and December 27, 2001. The "Prox 25" terms applied. Payment was due on the 25th day of the following month, January 25, 2002. However, the payment was made by a check dated February 4, 2002; BSI received the check on February 5, 2002.

During the 22 months prior to the preference period, each payment covered all invoices

issued during the prior month. Stipulation of Facts ¶ 14. According to NSC's 7056-1 Statement of Facts at ¶ 51 and BSI's 7056-2 Statement of Facts ¶ 51, the second transfer did not pay BSI invoices dated in the immediately preceding month but paid invoices from December 2001, the month two months prior.

NSC argues that because the second transfer covered invoices from two months prior, not one month prior, it was not ordinary. BSI argues that a better explanation is that every invoice payment throughout the entire prepetition period was received by the 10th day of the third month following the invoice date.

The second transfer did deviate from NSC's normal course by paying for invoices from two months prior rather than invoices from the preceding month. Examination of Exhibit C to the Stipulation of Facts reveals that in the pre-preference period invoices were paid between 32 and 68 days for an average of 45.65 days; in the preference period invoices were paid between 35 and 62 days for an average of 46.65 days.

### The Third and Fourth Transfers

The third and fourth transfers were made pursuant to "net 30" terms first agreed upon during the preference period; payments were due no later than the 30th day after the date of the invoice. The third transfer of $196,751 covered three invoices: as to invoice 8116414 dated January 3, 2002, payment was sent on February 14, 2002; as to invoice 8116591 dated January 10, 2002, payment was sent on February 14, 2002; as to invoice 8116858 dated January 15, 2002, payment was sent on February 14, 2002. These February 14, 2002, payments were received by BSI on February 20, 2002. Stipulation of Facts ¶ 21.

The fourth transfer of $99,068 covered two invoices: as to invoice 8117113 dated January

-3-

17, 2002, payment was sent on February 22, 2002; as to invoice 8117288 dated January 22, 2002, payment was sent on February 22, 2002. These February 22, 2002, payments were received by BSI on February 26, 2002. Stipulation of Facts ¶ 25.

## DISCUSSION AND ANALYSIS

### A. Prima Facie Case of Preferential Transfer

Pursuant to § 547(b) of the Bankruptcy Code a debtor may avoid a prepetition transfer of an interest of the debtor in property if it is

1) to or for the benefit of a creditor
2) for or on account of an antecedent debt owed by the debtor before such transfer was made
3) made while the debtor was insolvent
4) made
    A) on or within 90 days before the date of the filing of the petition; or
    B) between 90 days and a year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;
    and
5) that enables such creditor to receive more than such creditor would receive if
    A) the case were a case under Chapter 7 of this title;
    B) the transfer had not been made; and
    C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. §547(b). BSI was the debtor's creditor at the time of the receipt of the transfers. Stipulation of Facts ¶ 30. The second, third and fourth transfers were made within 90 days of the filing of the petition. Stipulation of Facts ¶ 21. The transfers were made on account of debts owed prior to the transfers. Stipulation of Facts ¶ 32. According to NSC's confirmed Chapter 11 plan, unsecured creditors holding allowed claims expect to receive a 1 - 1.5% dividend. NSC's 7056 - 1 Statement of Fact ¶ 85; BSI 7056 - 2 Statement of Facts ¶ 85. BSI's receipt of the transfers enabled it to receive more than it would have received if these cases had been administered under Chapter 7 and BSI had not received the transfers.

-4-

### B. The Ordinary Course Affirmative Defense

Section 547(c)(2) provides an ordinary course exception to avoidable preference liability where a transfer is

> A) a payment of a debt incurred by the debtor in the ordinary course of business
> B) made in the ordinary course of business or financial affairs of the debtor and the transferee and
> C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). This provision is designed to "leave undisturbed normal commercial and financial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of both the debtor and the debtor's transferee." *In re Armstrong*, 231 B.R. 723, 729 (Bankr. E.D. Ark. 1999).

BSI and NSC have stipulated that the requirements of § 547(c)(2)(A) and § 547(c)(2)(C) of the Bankruptcy Code have been met. Stipulation of Facts ¶¶ 28 - 29. The remaining issue is whether the transfers were "made in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(B). NSC argues that because the second transfer was late, it was presumptively non-ordinary as held by the Seventh Circuit in *In re Xonics Imaging Inc.*, 837 F.2d 763, 767 (7th Cir. 1988). "The conduct of a debtor, after becoming insolvent, in failing to make payments within the time required by his contract with the creditor is presumptively non-ordinary." *Id.*

Later Seventh Circuit decisions held that certain late payments can sometimes be the basis for an ordinary course defense and that such defenses must be analyzed by a multi-factor standard. First the Seventh Circuit ruled in *In re Tolona Pizza Products Corporation*, 3 F.3d 1029 (7th Cir. 1993), that normally a late payment will not be in the ordinary course of the debtor's and creditor's

business. However, it also explained that a "late" payment is not late if the parties have established a practice that deviates from the strict terms of their written contract. If late payments are generally made and accepted, this pattern of conduct represents the ordinary course of the parties' conduct. *Tolona*, 3 F.3d at 1032. Then in 2003 the Seventh Circuit ruled in *Kleven v. Household Bank F.S.B.*, 334 F.3d 638 (7th Cir. 2003), that ordinary course defenses must be tested according to the following factors: 1) the length of time the parties were engaged in the transaction at issue, 2) whether the amount or form of tender differed from past practice, 3) whether the debtor or creditor engaged in any unusual collection or payment activity, and 4) whether the creditor took advantage of the debtor's deteriorating financial condition. *See id.* at 642. The *Kleven* Court did not cite its *Xonics* ruling when it referred to its prior rulings on this issue. Subsequent courts have further outlined what is potentially ordinary activity for a creditor:

| POTENTIALLY ORDINARY CREDITOR ACTIVITY | POTENTIALLY NOT ORDINARY CREDITOR ACTIVITY |
|---|---|
| **creditor question**<br><br>When will payment due according to existing terms be received?– even if this question concerning payment had never been previously asked. | If payment for an antecedent debt is not received according to its terms and any one, some or all of the following activities are present, the payment may not be in the ordinary course of the parties' business: |
| **creditor communication**<br><br>There is increased concern about receipt of payment due according to existing terms–even if such a concern had never been previously expressed. | 1. creditor change from prior or existing credit terms.<br><br>2. creditor change from prior or existing credit limits. |
| **creditor frequency**<br><br>There are repeated requests for payment or expressions of concern about payment due according to existing terms–even if there had never been such repeated requests. | 3. creditor change from prior or existing sales of goods and services.<br><br>4. creditor change from prior or existing shipment of goods and services.<br><br>5. creditor change from the existing required amounts of payments to be made. |
| **identity of creditor contact**<br><br>There is contact by senior management or a creditor representative with increased authority involving credit decisions concerning payment due according to existing terms–even if there was never contact by such senior management or a creditor representative. | 6. creditor change from the existing required timing of payments to be made.<br><br>7. creditor changes in future credit terms, limits, sales, shipments, the amount of payments required or the timing of payments. |

*Roberds, Inc. v. Broyhill Furniture (In re Roberds Inc.)*, 315 B.R. 443, 458-59 (Bankr. S.D. Ohio 2004).

### C. Application of the Multi-Factor Tests

BSI supplied ferroalloys to NSC for more than ten years prior to the petition date; for more than two years prior to the preference period, it was sold pursuant to "Prox 25" terms. Stipulation of Facts ¶¶ 10, 12. Except for a May 2000 payment, in the twenty-two months prior to the preference period, NSC made one payment each month to BSI, and each monthly payment paid all BSI invoices in the month prior to the date of the check. Stipulation of Facts ¶ 14. This information concerning when payments were received over the course of the entire relationship is more instructive in this matter. What matters most is a comparison of how long it took NSC to pay invoices in the pre-preference period to how long it took in the preference period.

The amount and form of tender varied from the pre-preference period to the preference period in one limited regard: the February 4, 2002, check covered invoices from December 2001 (two months prior) rather than one month prior. In actuality this meant that the check may have been ten days late. In effect it was not later than other habitually "late" payments because of the overnight mode of delivery the debtor used for the second transfer (and only the second transfer).

The same range-of-days evidence also tends to show that the **debtor** did not engage in unusual payment activity other than the overnight mode of delivery on one occasion. **BSI** did not engage in any unusual payment activity at all. It did not sue, declare the contract in default, refuse to deliver or demand prepayment; this is proof that it did not engage in unusual collection activity. NSC's director of corporate accounting, Robert Foley, acknowledged at a deposition that the second transfer was late but that he did not know why. Robert Foley Dep., page 41,

lines 6-16. This does not show that nonordinary conduct by BSI caused this slightly late payment.

BSI did not take advantage of NSC's deteriorating credit condition to protect itself. Plaintiff has neither alleged nor offered evidence of such. In fact, when the petition was filed, BSI held nine unpaid invoices.

In conclusion, the ordinary course defense applies to the second transfer primarily because it took as long for BSI to obtain payments pre-preference - 45.65 days - as it did to receive payment during the preference period - 46.65 days. The single fact that the debtor unilaterally switched the mode of delivery from regular mail to overnight mail is not sufficient to alter the applicability of the affirmative defense.

The next issue is whether the parties' conduct regarding the third and fourth transfers was ordinary as to those payments. Viewing them separately from the second transfer which was governed by "Prox 25" terms, the pattern, the ordinary course, continues to be one of ordinary lateness, i.e., their ordinary course was for those payments to arrive a few days late. No significant change in collection practices by the creditor or payment practices by the debtor occurred during the period of time that the third and fourth transfers occurred. The change to "net 30" did not significantly impact NSC's actual payment conduct. Thus, should the imposition of "net 30" terms during the preference period make the third and fourth transfers not ordinary?

That a new term governed the parties' relationship during the preference period is an appropriate component of an ordinary course analysis. The more determinative component is an analysis of whether this actually impacted the parties' credit and payment practices. *Roberds,*

*Inc. v. Broyhill Furniture (In re Roberds Inc.)*, 315 B.R. 443, 459 (Bankr. S.D. Ohio 2004). The *Roberds* Court also addressed whether communications and activities can be "ordinary" in the course of a debtor/creditor relationship if the communications and activities had never previously occurred in the parties' history. It stated:

> Since every business relationship must begin with an initial transaction between the parties, and § 547(c)(2) contains no exclusion for first time transactions, it would unnecessarily restrict the meaning and intent of the statute to exclude a first time transaction from the benefit of the defense, even though, obviously, the transaction could not have previously occurred.

*Roberds*, 315 B.R. at 457. In <u>*Gosch v. Burns (In re Finn)*</u>, 909 F.2d 903, 908 (6th Cir. 1990), the Six Circuit said:

> We hold that, as a general rule, subject to the individual fact-finding powers of the district court in a specific inquiry, a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer. This rule holds where the transaction would not be out of the ordinary for a person in the borrower's position.

These cases address parties' initial transactions and indicate that they can be considered as ordinary course. It should follow that where a term is introduced for the first time, as "net 30" was here, it too qualifies for ordinary course status subject to the multi-factor standard, even though it was a term not pursued before.

The contractual change in payment terms during January 2002 creates an important issue, especially when one considers the weight placed herein on the fact that the regularity and timing of the debtor's preference-period payments was so nearly identical to those during the pre-preference period. Was this regularity and consistency during the preference period the product of the stricter payment terms, or would they have been regular and consistent anyway?

In other words, was the regularity and consistency incidental to the contractual change in payment terms? The mere fact that this change occurred is not sufficient to support a reasonable inference that it was not incidental, i.e., that it induced conduct on the debtor's part. In any event, the defendant has noted the lack of evidence indicating that the term change induced specific conduct.

The combination of NSC's established payment practices, the use of the mail to deliver checks, and BSI's understanding that "net 30" included some slippage to account for time to issue the check and time to mail the check, see Stipulation of Facts ¶¶ 24 - 25; Foley Dep. 48: 6 - 19, 49: 14 - 17, shows that the parties did not contemplate a strict, literal interpretation and use of "net 30." NSC's director of corporate accounting, Mr. Foley, said on page 49 of his deposition that the way NSC used "net 30," regular payments could slip beyond 30 days. The parties understood that check arrival would not necessarily occur by the thirtieth day because NSC cuts checks only on four specific days each month. One of those days could coincide with the thirtieth day. Additionally, a fact-specific analysis of the parties' course of conduct regarding the ferroalloys contracts reveals that although BSI got NSC to agree to change the payment term form "Prox 25" to "net 30," there was no real, material change in payment practices. That the payment ranges pre-preference and during the preference period are virtually identical indicate that there was no change in NSC's payment behavior. Thus, although the third and fourth transfers were contractually late according to the new terms of "net 30," they were contractually timely under the long-established terms of "prox 25," as the debtor mailed the third and fourth transfers eleven days and three days prior to February 25, 2002, respectively.

In addition, the payment-term change during the preference period was negotiated

bilaterally. It was not unilaterally imposed by BSI. Stipulation of Facts ¶ 22; Baldridge Affidavit ¶¶ 5 - 9. The new term increased the price discount from 2% to 2.5% to ameliorate any effect of shortening the payment terms to "net 30." On balance, then, this change also benefitted the debtor as it got an increased discount for payments made a few days sooner. The change to "net 30" was a change from prior or existing payment requirements, but what *Roberds* condemned was a creditor-imposed change, while the change in this case received input and approval from the debtor. NSC asserts that BSI demanded that NSC indicate on its purchase orders that it would be able to pay for its order, and after BSI warned NSC that if payments slipped, BSI would require payment by wire transfer. Though BSI *attempted* to obtain these terms, the debtor would not agree, and these terms did not become part of the parties' contract. Supp. Aff. of Richard Baldridge ¶¶ 9, 10, & 11. Since annual renegotiation of the contract was ordinary, the creditor's noncoercive attempt to resolve issues pertaining to wire-transfer payments and solvency representations was also ordinary in this situation. "These suggested guidelines may be conceptually considered the difference between a creditor asking and a creditor acting; in essence, a legal application of the adage – 'it can't hurt to ask.'" *In re Roberds*, 315 B.R. 443, 458 (Bankr..S.D. Ohio 2004).

*Hechinger Inc. Co. Of Delaware v. Universal Forest Products, Inc. (In re Hechinger Inv. Co. of Delaware)*, 326 B.R. 282 (Bankr. D. Del. 2005), *affirmed*, --- B.R. ----, 2006 WL 679782 (D. Del. 2006), was different in that the court found a creditor's unilateral change of credit terms to be unqualified for the ordinary course exception. There the terms were changed from net 30 (with a 1% discount for 10 days and 7 - day mail float) to net 8 (with a 1% discount for 7 days with remittance by wire). *Id.* at 287. Debtor's previous unlimited open line of credit

was then closely monitored. *Id.* The change in that case was a significant departure from the way the parties had done business throughout their 15 - year relationship, and the changes occurred shortly before the preference period, including a requirement that the debtor make lump-sum payments of $500,000 or $1 million. *Id.* at 292. In contrast to the bilateral negotiation here, the debtor's vice president testified that he was never told of a $500,000 credit limit and that the credit limit would not have been workable due to the volume of business between the parties. *Id.* at 287. The changes required larger and more frequent payments. The creditor's efforts did not foster the goal of protecting recurring, customary credit transactions incurred and paid in the ordinary course of business of the debtor and transferee. Instead of protecting recurring transactions, that creditor materially changed the way those parties conducted business. In the case at bar the amount and form of the payments did not change in any material regard. BSI did not engage in any unusual collection activity. It requested payment by wire transfer, which NSC rejected. It did not refuse to ship during the preference period; in fact BSI made nine shipments which remained unpaid when the bankruptcy petition was filed. BSI did not declare NSC in breach of the contract, and it did not sue NSC.

The ordinary course defense should protect the kind of regularly occurring, consistent conduct that BSI and NSC exhibited. The Court concludes that the third and four transfers qualify under the affirmative defense because, in spite of the new term, payments made during the preference period were within the same range of days as the pre-preference payments, differing by one day. It was customary for the parties to renegotiate the contract terms each year. Stipulation of Facts ¶ 22. Essentially, nothing changed.

Creditors should not be punished for dealing with troubled companies; thus, preferences

should "leave undisturbed normal financial relations, because they do not detract from the general policy of the preference section to discourage unusual action by either the debtor or creditors during the debtor's slide in to bankruptcy." *In re Tennessee Valley Steel Corp.*, 203 B.R. 949, 952 (Bankr. E.D. Tenn. 1996).

## NEW VALUE DEFENSE

The parties have stipulated that the new value defense would apply under various scenarios regarding three of the four transfers asserted as being new value. Stipulation of Facts ¶¶ 34 - 39.

The remaining contested new value issue is whether the goods related to invoice 8118517 were provided subsequent to the second transfer. The evidence, to date, does not establish that this shipment was received after the second transfer on February 5, 2002. However, because BSI has prevailed herein on its ordinary course defense, it does not need to establish the new value defense, which reduces preference liability. There is no liability to reduce.

## CLAIMS UNDER § 502(D) AND § 550

Once a transfer is avoided under section 547, the trustee may recover the property transfered for the benefit of the estate, or if the court so orders, the value of such property from the transferee. 11 U.S.C. § 550. Section 502(d) of the Bankruptcy Code provides that unless an entity or transferee receiving a payment that is a voidable preference under section 547 has paid the amount for which such entity or transferee is liable under section 550 of the Bankruptcy Code, any claim of such entity or transferee will be disallowed. Having found that BSI has no preference liability to NSC, the relief requested in Counts II and III of the Complaint to disallow

BSI's claim under section 502(d) is DENIED.

Dated: March 28, 2006                                    ENTERED:

                                                         _____
                                                         Jacqueline P. Cox
                                                         United States Bankruptcy Judge